OPINION OF THE COURT
Robert F. Julian, J.
*412 Relief Requested: The Town of New Hartford moves for summary judgment pursuant to CPLR 3212 for a declaration that to the extent that school crossing guards are hired to cross school children within the confines of the Village of New Hartford, the expense is properly borne by the Village rather than the Town. The Town further asks the court to find that the Town cannot legally pay for crossing guards who perform that function within the Village. The Village cross-moves for summary judgment for a declaration that the Town is bound by agreement to provide crossing guards to the Village as a function of the town police department.
Holding: School crossing guards perform a police function of the town police department pursuant to Town Law § 150 and General Municipal Law § 208-a, and therefore the cost of crossing guards is properly a town-wide charge. The Town, pursuant to Town Law § 154, solely determines the status of crossing guards. There is no agreement between the parties that binds the Town to fund crossing guards. Because crossing guards are a police function, the Town may hire and assign them.
Discussion: The Village of New Hartford is wholly contained within the Town of New Hartford. In 1984 the Village operated a police department that was staffed by police officers and school crossing guards. The Town did not have a police department in 1984. The Village voted to disband its police department in a 1984 referendum. Prior to the referendum, the Town and Village had negotiated and reached an agreement that the Town would operate a town-wide police force absorbing the personnel of the village department. Thereafter, the Village, by Local Law No. 1 (1984) of the Village of New Hartford, disbanded its police department, turning its equipment over to the Town, which in turn created a police department as of January 1, 1985 and hired the members of the former village police department including the school crossing guards, who were given the title of school safety officers. The Town states in its moving papers: “as part of the understanding when the changeover occurred, three police patrol zones were established, one in the Village, and two outside the Village, with each zone provided one 24-hour police car patrol.” (Affidavit of V Rossi, Jr., Esq.) Local Law No. 1 (1984) adopted by the village board transfers all of its equipment and cars over to the Town “in consideration of the police protection being furnished by the Town of New Hartford.” Since January 1, 1985 the Town of New Hartford has employed all of the school crossing guards utilized in the Town, including the Village.
*413 The Town of New Hartford is empowered to organize and operate a police department pursuant to Town Law § 150 (1), which provides that “[t]he town board of any town may establish a police department and appoint a chief of police and such officers and patrolmen as may be needed and fix their compensation.” When the Village of New Hartford opted in 1984 to disband its police department, the payment of town police officers properly became a town-wide charge:
“The compensation of such policemen shall be a town charge; providing however, no assessment on property in any village within any town or partially within any town shall be made for the maintenance or operation of a town police department established after January first, nineteen hundred sixty, pursuant to this section if any such village maintains a police department of four or more policemen on an annual or full-time basis, established or maintained under the rules of civil service.” (Town Law § 150 [1].)
General Municipal Law § 208-a governs the role of the school crossing guards — a statute contained within article 10 of the General Municipal Law entitled “Firemen and Policemen.” Section 208-a provides:
“The duly constituted authorities of any city, town, or village or any county police department or police district may designate, authorize and appoint such a number of persons as such authority shall deem necessary, and at such salaries as such authority shall deem advisable, as school crossing guards to aid in protecting school children going to and from school, and church crossing guards to aid in protecting persons going to and from places of worship, and for such purpose shall have power to control vehicular traffic within such municipality.”
In the case at bar the Town argues that it is prohibited by section 208-a from charging in the town-wide police budget for school crossing guards. The Town maintains that there are a number of part town districts, that the crossing guards serve the Village, thus there should be a charge to the Village for the cost of compensating the crossing guards. The Town cites in support of its position informal opinions from the State Comptroller and a letter opinion from the General Counsel for the New York State Association of Towns. (1969 Ops St Comp No. 69-122; 1977 Ops St Comp Nos. 77-668, 77-277; 1979 Ops St Comp No. 79-476.)
*414 The Village asserts that school crossing guards were part of the police department when the Town assumed the village police department, that the Town commenced compensating crossing guards at that time, and that the Town is obligated to continue to compensate crossing guards as a town-wide charge based on the agreement between the two governments. The Village in its cross motion asks for a declaration that “to the extent that school crossing guards are hired to cross school children within the confines of the Village of New Hartford, the expense of such crossing guards is properly borne by the Town of New Hartford rather than the Village of New Hartford by agreement.”
On the issue of whether or not there was a binding agreement between the municipalities which required the Town to pay for school crossing guards, the Village asserts that there was such an agreement although it is unable to reference any specific, clear, unambiguous language in support of its position. The Town counters with several alternative arguments which are summarized as follows: if there was an agreement regarding the crossing guards the term has expired because any such agreement is limited to five years by law; if there was an agreement to assume the village police department it did not involve school crossing guards, only police officers; and that there was no agreement because the Town opted to create a police department only after the Village, by referendum, decided to disband its police department and turn its police equipment, cars, and uniforms over to the Town. As mentioned above, the Town also maintains that it is illegal for the crossing guards to be paid as a town-wide charge and asks the court to so declare.
The court finds that there was a meeting of the minds between the town and village leaders in 1984-1985 that:
a. The Village would disband its police department and turn its police equipment, cars and uniforms over to the Town.
b. The Town would create a town-wide police department and hire the village police department, including the school crossing guards.
3. The Town would provide 24-hour service to a village zone as referenced above.
The court next turns to the issues of the scope and duration of the agreement and whether or not it is binding upon the Town regarding crossing guards.
The court finds that the parties in 1984-1985 agreed that the Town was organizing a town-wide police department pursuant *415 to Town Law § 150. Based upon that agreement the Village disbanded its police department and the Town absorbed the village employees, including the school crossing guards. The entire agreement is in compliance with Town Law § 150. Section 150 (4) further provides that a town may, by local law, abolish its police department subject to a permissive referendum. Therefore, by implication the duration of the agreement that the Town would operate a police department would be until the same was abolished pursuant to law.
However, in 1984-1985 the parties did not agree upon a specific duration or staffing level regarding crossing guards or for that matter, any other staffing levels or functions except for the previously conceded specific agreement regarding the providing for a separate patrol zone for the Village. Because there was no specific agreement, article 10 of the Town Law controls. More specifically, Town Law § 154 provides that the town board and/or the town police commissioner determine budget, staffing, hiring and firing for the police department. The court explains later in this decision its finding that crossing guards perform a police function. Based on that finding, it is within the discretion of the Town pursuant to Town Law § 154 to provide crossing guards and determine their number and deployment.
The next issue the court must resolve is whether or not, as the Town asserts, it is illegal for the Town to use town-wide funds for crossing guards based on the assertion that the maintenance of crossing guards is a village function pursuant to section 208-a. The Town cites opinions of the State Comptroller to this effect. (1969 Ops St Comp No. 69-122; 1977 Ops St Comp No. 77-668; 1979 Ops St Comp No. 79-476.) The court has reviewed those opinions and finds them to be devoid of any basis; they are the bare conclusions of attorneys in the State Comptroller’s office, and as will be seen below, are inconsistent with earlier opinions of the State Comptroller’s Counsel. Buttressed by the opinion of the State Comptroller (1979 Ops St Comp No. 79-476), the Town argues that because crossing guards are not peace officers, they are not part of the police function of the Town. Although the Town does not specifically cite Town Law § 150, the court infers that the Town’s argument is that therefore crossing guards should not be included as a part of the town police department authorized by Town Law § 150 and created by the Town in 1985 pursuant to that statute.
Upon a review of the Bill Jacket of section 208-a (the legislative history including memoranda of support and opposition), *416 the court notes that Town Law § 150 et seq. preceded the adoption of section 208-a and, thus, the drafters of the latter statute were well aware in 1956 when section 208-a was adopted that any town could opt to create a town-wide police department, that a village with a police department could opt out of operating a department, and that as a result the cost of operating the department would be a town-wide charge.*
The Bill Jacket of section 208-a clearly reflects the intent of the Legislature and the understanding of those governing this state in 1956 and 1957 when section 208-a was originally passed and initially amended that crossing guards were performing a police function and therefore part of a police department.
For example, in a memorandum to Governor Harriman, Morgan Strong of the Conference of Mayors in 1956 set forth why section 208-a was proposed, urging its approval:
“This bill would permit municipal corporations to appoint school guards and give such school guards authority to regulate vehicular traffic within two blocks of any such school. A recent ruling of the Department of Audit and Control held that only police officers can regulate traffic. Such police officers must meet all the physical requirements established by the Civil Service Department. Municipalities are unable to hire physically qualified policemen for a few hours a day to guard school crossings. This bill empowers school crossing guards to regulate traffic and therefore would permit municipalities to hire retired persons or women for such positions for only a few hours a day.” (Bill Jacket, L 1956, ch 255.)
Harold Siegel of the United Parents Association advised Governor Harriman that civilian crossing guards “have been found to be very effective not only with increasing safety factors for children going to and from school, but also have been able to relieve policemen from duty at the most dangerous intersections.” (Letter from Harold Siegel to Judge Gutman, Bill Jacket, L 1956, ch 255.)
State Senator MacNeil Mitchell in 1957 successfully proposed an amendment to the 1956 version of section 208-a that eliminated a provision that allowed crossing guards to act only within 200 yards of schools. Senator Mitchell states in a letter *417 to Governor Harriman urging the signing of his amendment that “[t]his legislation would authorize any municipality to appoint school crossing guards and would eliminate the limitations regarding distances within which vehicular traffic may be controlled by such school crossing guards.” (Bill Jacket, L 1957, ch 784.)
Indeed, in 1957 the State Comptroller’s Office, per Arthur Haight, Counsel to the Comptroller, wrote to Governor Harriman in support of Senator Mitchell’s bill that “[t]his bill would authorize any city, town or village to appoint school crossing guards and would eliminate the limitation regarding distances within which vehicular traffic may be controlled by such crossing guards.” (Bill Jacket, L 1957, ch 784.)
The legislative and administrative intent that crossing guards perform a police function carried into the 1960’s. Then Attorney General Louis Lefkowitz in a memorandum to then Governor Rockefeller on March 29, 1967, as is noted in the Bill Jacket to an amendment of section 208-a, reasoned that crossing guards were created and empowered to provide a safety function that was being performed by the police:
“This bill amends the General Municipal Law to authorize the appointment, by a municipal police department, of church crossing guards to protect persons going to and from places of worship. These guards, as are school crossing guards, would be provided outside of the normal police force for a limited purpose. This bill is a valid police power enactment in securing the safety of pedestrians in an area of heavy pedestrian crossing of public thoroughfares and its validity is not affected by the destination of these pedestrians.” (Bill Jacket, L 1967, ch 131.)
In further support of the concept that crossing guards perform a police function, pursuant to Vehicle and Traffic Law § 1102 it is a violation to disobey the lawful order of crossing guards. (People v Jennings, 75 Misc 2d 408 [1973].)
To add to the cacophony of confusion engendered by advisory opinions, in 1984 the New York Attorney General determined that it was within the powers of school crossing guards to control traffic for the purpose of contributing to the safety of children in school buses, thus meaning that the function performed by the guards does not benefit only village residents who walk to school, but also town residents who are driven there. (1984 Ops Atty Gen No. I 84-30.)
*418 Neither the Bill Jacket nor the actual language of section 208-a sets forth the limitation the Town seeks to impose in the case at bar, to wit: crossing guards employed by a town who are serving within a village that is wholly contained within the town must be paid for by the village because they do not perform a police function.
It is not coincidence or happenstance that the Legislature placed section 208-a with the article of the General Municipal Law entitled “Firemen and Policemen” — crossing guards were created to perform a police function. The clear purpose of this legislation is to enhance public safety and to supplement the police departments by giving school crossing guards and church crossing guards a small part of the police function. Attorney General Lefkowitz characterized section 208-a best as a “police power enactment.” Control of traffic is an exercise of the municipality’s police power. (See State of New York v Long Is. Light. Co., 129 Misc 2d 371 [1985]; Ricketts v City of New York, 181 Misc 2d 838 [1999].)
In summary, there can be no doubt that in 1985 the Town assumed all responsibilities for police protection within the Village, including traffic control and safety. By two acts, December 1984 and January 1985, the Town created a police department. It adopted a resolution pursuant to Town Law § 150 (1) hiring a police chief and police officers and it adopted a resolution hiring full-time police officers, part-time police officers, and five school traffic officers (crossing guards) — all former village employees. It is undisputed that the Town has paid crossing guards since that date. Asserting that its prior actions were illegal, the Town cites a 1979 Comptroller’s opinion that crossing guards are not peace officers and “therefore not properly classified as a part of a police department.” (1979 Ops St Comp No. 79-476.) Of course this opinion is contrary to the Attorney General’s opinion “that school crossing guards are basically policemen or policewomen.” (1965 Atty Gen [Inf Ops] 115.) The court finds that the language of section 208-a, which allows “duly constituted authorities” to appoint crossing guards, applies to the town board or the police commissioner of the town if one exists. The court further finds that the village board in 1984 abolished its police department and the town board created a town-wide police department which included a hiring of crossing guards who served and were stationed in the Village. These actions are within the ambit of the Town’s powers to “control vehicular traffic with such municipality.” (§ 208-a.) Therefore, pursuant *419 to section 208-a as explained above, school crossing guards perform a police function and the Town may properly charge on a town-wide basis for that function for as long as it has an organized police department pursuant to Town Law § 150.
Because the court is taking judicial notice of:
(1) The Bill Jacket of General Municipal Law § 208-a (a copy of the same is in the court’s file and available for review by counsel);
(2) A referendum held in 1984 by the Village in which the abolition of the village police department was approved. The parties shall have until August 20, 2004 to review those items and interpose any further argument regarding judicial notice of those items and/or why this decision should not be the court’s final decision. Absent objections or further argument this decision shall become final on that date.
Therefore this court finds as follows absent an objection after the aforementioned review:
(1) The town-wide charge in the police budget for school crossing guards is legal because school crossing guards pursuant to statute perform a police function of the town-wide Town of New Hartford Police Department.
(2) There was no agreement between the parties regarding staffing and funding crossing guards for any duration. The Town pursuant to Town Law § 154 is responsible for police functions and has the discretion to fund and deploy school crossing guards.

 Town Law § 150 was adopted in 1932 (L 1932, ch 634), and was amended thereafter. It was in its content the same in 1956 as it is today. General Municipal Law § 208-a was adopted in 1956 (L 1956, ch 255, § 1).